Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

————

Argued January 16, 2004      Decided February 24, 2004

No. 03-1018

MARGENE BULLCREEK, ET AL.,
PETITIONERS

v.

NUCLEAR REGULATORY COMMISSION AND
UNITED STATES OF AMERICA,
RESPONDENTS

PRIVATE FUEL STORAGE, L.L.C. AND
SKULL VALLEY BAND OF GOSHUTE INDIANS,
INTERVENORS

————

Consolidated with
No. 03-1022

————

On Petitions for Review of an Order of the
Nuclear Regulatory Commission

————

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*Thomas R. Lee* argued the cause for petitioners. With him on the briefs were *Mark L. Shurtleff*, Attorney General, Attorney General's Office of the State of Utah, *Monte N. Stewart*, Special Assistant Attorney General, *Denise Chancellor* and *Connie Nakahara*, Assistant Attorneys General, and *Paul C. EchoHawk*.

*Grace H. Kim*, Attorney, U.S. Nuclear Regulatory Commission, argued the cause for respondent U.S. Nuclear Regulatory Commission. With her on the brief were *Karen D. Cyr*, General Counsel, *John F. Cordes, Jr.*, Solicitor, and *E. Leo Slaggie*, Deputy Solicitor.

*Jay E. Silberg* argued the cause for intervenors. With him on the brief was *Tim Vollmann*.

Before: ROGERS and GARLAND, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: The issue on appeal is whether § 10155(h) of the Nuclear Waste Policy Act of 1982, 42 U.S.C. §§ 10101 *et seq.*, repealed or superseded the authority of the Nuclear Regulatory Commission ("NRC") under the Atomic Energy Act of 1954, 42 U.S.C. §§ 2011 *et seq.*, to license the storage of private spent nuclear fuel at privately owned away-from-reactor storage facilities. The State of Utah and others challenged the NRC's jurisdiction to grant a private license to develop and operate a private away-from-reactor storage facility on the ground that § 10155(h) barred such facilities. The NRC rejected Utah's interpretation of § 10155(h) and declined to institute a rulemaking to amend its regulations. Utah and others seek review of the order denying the petition to institute a rulemaking, contending that the NRC's interpretation is contrary to the plain language of § 10155(h) and to the structure and legislative history of the Nuclear Waste Policy Act. We hold that § 10155(h) does not repeal or supersede the NRC's authority under the Atomic Energy Act to license private away-from-reactor storage facilities, and we therefore deny the petitions for review.

**I.**

The Atomic Energy Act of 1954 ("AEA"), 42 U.S.C. §§ 2011 *et seq.*, authorized the NRC to regulate the possession, use, and transfer of the constituent materials of spent nuclear fuel, including special nuclear material, source material, and byproduct material. *See id.* §§ 2073, 2092, 2093, 2111, 2201(b); *see also* 10 C.F.R. § 72.3 (2003). While the AEA does not specifically refer to the storage or disposal of spent nuclear fuel, it has long been recognized that the AEA confers on the NRC authority to license and regulate the storage and disposal of such fuel. *See Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 207 (1983); *Illinois v. Gen. Elec. Co.*, 683 F.2d 206, 214–15 (7th Cir. 1982); *Jersey Cent. Power & Light Co. v. Township of Lacey*, 772 F.2d 1103, 1112 (3rd Cir. 1985). Pursuant to its AEA authority, the NRC promulgated regulations in 1980 for licensing onsite and away-from-reactor spent nuclear fuel storage facilities for private nuclear generators. *See* 10 C.F.R. Part 72.

Two years later, Congress enacted the Nuclear Waste Policy Act of 1982 ("NWPA"), 42 U.S.C. §§ 10101 *et seq.*, in response to "a national problem" created by the accumulation of spent nuclear fuel from private nuclear generators, as well as radioactive waste from reprocessing such fuel, activities related to medical research, diagnosis, and treatment, and other sources. *Id.* § 10131(a)(2). Finding inadequate the federal efforts in the past 30 years to devise a permanent solution, *id.* § 10131(a)(3), Congress established a schedule for siting, construction, and operation of a permanent federal repository (Subtitle A), *id.* §§ 10131–10145, and developed a federally monitored retrievable storage program in the event the permanent repository was unavailable by the specified deadline (Subtitle C). *Id.* §§ 10161–10169. Finding further that the generators and owners of high-level radioactive waste and spent nuclear fuel have "the primary responsibility to provide for, and . . . to pay the costs of, the interim storage of such waste and spent fuel," *id.* § 10131(a)(5); *see also id.* § 10151(a)(1), Congress, under Subtitle B, *id.* §§ 10151–10157, limited the federal government's obligation to assist

private nuclear generators with interim storage of spent nuclear fuel. As a precondition of federal interim storage, private generators were required to exhaust onsite options for storage. *Id.* § 10155(b)(1); *see also id.* §§ 10151(a)(1), 10152. While the NRC was responsible for the licensing of technology used at the reactor site, *id.* §§ 10153–10154, and for developing the criteria for eligibility, *id.* § 10155(g); *see also id.* § 10155(a)-(b), the Department of Energy ("DOE") was directed to provide, and authorized to enter into contracts for, interim storage of not more than 1,900 metric tons of capacity, but only until January 1, 1990. *Id.* §§ 10155(a)-(b), 10156(a)(1). That said, Congress provided:

> Notwithstanding any other provision of law, nothing in this chapter [108, Nuclear Waste Policy,] shall be construed to encourage, authorize, or require the private or Federal use, purchase, lease, or other acquisition of any storage facility located away from the site of any civilian nuclear power reactor and not owned by the Federal Government on January 7, 1983.

*Id.* § 10155(h).

The dispute over the effect of § 10155(h) on the NRC's authority under the AEA to license private away-from-reactor storage facilities arises in connection with a lease. The Skull Valley Band of Goshute Indians ("Band") entered into a lease with Private Fuel Storage, LLC ("PFS") for the development of a private away-from-reactor spent nuclear storage facility on the Band's reservation located 50 miles west of Salt Lake City, Utah. Pursuant to NRC regulations, *see* 10 C.F.R. §§ 72.1, 72.16–72.40, PFS filed a license application, and the NRC's Atomic Safety and Licensing Board ("Board") initiated an adjudicatory licensing proceeding. *See In the Matter of Private Fuel Storage, LLC*, 47 NRC 142 (1998) (hereinafter "*Licensing Proceeding*"). After permitting the State of Utah and the Ohngo Gaudadeh Devia ("OGD"), an association consisting primarily of members of the Band, to intervene, *id.* at 169, the Board concluded that it lacked jurisdiction to decide whether § 10155(h) excluded from the nuclear waste management program the creation and use of private away-

from-reactor storage facilities because such argument constituted an attack on the NRC's regulations. *Id.* at 183–84.

Proceeding to the NRC, Utah made two filings in 2002. The first was a "Suggestion of Lack of Jurisdiction," claiming that the NRC lacked jurisdiction over PFS's license application. Utah argued that Congress had established in the NWPA a "comprehensive national nuclear waste management system for the storage of [spent nuclear fuel]," and § 10155(h) made clear that the storage of such fuel at privately owned away-from-reactor facilities was prohibited. The second filing was a "Petition to Institute Rulemaking and to Stay Licensing Proceeding" to amend 10 C.F.R. Part 72 in light of § 10155(h)'s repeal or supersession of the NRC's authority under the AEA to regulate private away-from-reactor facilities, and to suspend the licensing proceedings during the rulemaking. The OGD also submitted a brief to the NRC adopting the arguments advanced by Utah's petitions.

The NRC declined to stay the licensing proceeding. *See In the Matter of Private Fuel Storage, LLC*, 55 NRC 260, 261–62 (2002). The NRC also rejected Utah's argument that it lacked jurisdiction to issue PFS's license, and denied Utah's request for rulemaking. *See In the Matter of Private Fuel Storage, LLC*, 56 NRC 390 (2002) (hereinafter "*Rulemaking Order*"). The NRC interpreted § 10155(h) to have no effect on its licensing authority under the AEA of private away-from-reactor storage facilities. *Id.* at 396–401. Observing that § 10155(h) contains no prohibitory language and "is facially neutral on the question of the NRC's general AEA authority to license [private] away-from-reactor" facilities, *id.* at 397, the NRC opined that Congress intended § 10155(h) "to recognize and distinguish, not abrogate, existing provisions of law authorizing [away-from-reactor] spent fuel storage." *Id.* at 401. As each word has its own significance when read in the context of the whole of Subtitle B, the NRC concluded that Congress simply "limited the scope of [§ 10155(h)] to those programs created under the NWPA itself." *Id.* at 397–98. By providing that the NWPA did not "authorize" the use of a private storage facility, Congress

limited DOE's authority. *Id.* at 398. As DOE's authority to store spent nuclear fuel originated with the NWPA, § 10155(h) ensured that DOE would not take over a private facility to fulfill DOE's obligations under the NWPA. *Id.* The NRC's authority, on the other hand, to license private generators to store spent nuclear fuel, originated with the AEA, and hence the NWPA's failure to "authorize" storage at private facilities had no effect on this preexisting authority. *Id.* The NRC pointed out that Congress did not need to provide that the NWPA did not "encourage" or "require" DOE to use private facilities, but did need to use those terms in describing the NWPA's conditions on private generators' use of federal interim storage. *Id.* Subtitle B included several provisions that "encourage[d]" private generators to expand onsite storage, *see* 42 U.S.C. §§ 10152–10154, and through § 10155(h), the NRC reasoned, Congress made clear that such provisions were not also encouraging the expansion of private away-from-reactor storage. *Id.* Context and legislative background further explained why Congress would specify that the NWPA did not "require" private away-from-reactor storage: such a requirement appeared early in the legislative process and in prior bills. *Id.* at 398–99. By contrast, the NRC noted, Utah's interpretation of § 10155(h) as repealing or superseding the NRC's authority under the AEA provided no role for "encourage" and "require" to play. *Id.* at 397–98. The NRC thus concluded that neither the text of § 10155(h) nor the NWPA's structure or legislative history indicated that Congress intended to repeal or supersede the NRC's authority under the AEA to license and regulate private away-from-reactor spent fuel storage facilities. *Id.* at 396–411.

## II.

Utah, the OGD, and nine individual Goshute members petition for review of the NRC's *Rulemaking Order*, renewing the arguments before the NRC in challenging the NRC's interpretation of § 10155(h). The petitioners read § 10155(h) to prohibit the creation or use of private away-from-reactor storage facilities, and thus to repeal or supersede prior

statutory authority authorizing private away-from-reactor storage facilities for spent nuclear fuel. Contending that the plain text, structure, and legislative history of the NWPA support their interpretation of § 10155(h), the petitioners seek to have the court direct the NRC to amend its 10 C.F.R. Part 72 regulations. We address two threshold issues on standing and our standard of review in Part II, and then turn to the merits in Part III.

**A.**

The NRC and the intervenors, PFS and the Band, challenge the standing of certain petitioners under the Hobbs Act, 28 U.S.C. § 2344. The Hobbs Act requires that a party participate in the underlying agency proceeding and meet the requirements of constitutional and prudential standing. *See Reyblatt v. NRC*, 105 F.3d 715, 720 (D.C. Cir. 1997); *see also S. Pac. Transp. Co. v. ICC*, 69 F.3d 583, 587 (D.C. Cir. 1995). It is undisputed that Utah has standing; it participated below and the administrative record reflects that it met the requirements of constitutional and prudential standing, *see Licensing Proceeding*, 47 NRC at 169. *Cf. Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102–04 (1998); *City of Waukesha v. EPA*, 320 F.3d 228, 233–35 (D.C. Cir. 2003). Hence, inasmuch as the petitioners have filed a joint brief, *cf. Ala. Power Co. v. FCC*, 311 F.3d 1357, 1364–65, 1366–67 (11th Cir. 2002), the court need not decide whether the other petitioners have standing to challenge the NRC's *Rulemaking Order*. *See Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 793 F.2d 1322, 1328–29 n.41 (D.C. Cir. 1986); *see also Chemehuevi Tribe of Indians v. FRC*, 489 F.2d 1207, 1212 n.12 (D.C. Cir. 1973), *vacated on other grounds*, 420 U.S. 395 (1975).

**B.**

The court typically defers under *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984), to an agency's interpretation of its own jurisdiction under a statute that it implements. *See Okla. Natural Gas Co. v. FERC*, 28 F.3d 1281, 1283–84 (D.C. Cir. 1994). But such deference may be inappropriate where

more than one agency implements the same statute. *See Collins v. NTSB*, 351 F.3d 1246, 1252–53 (D.C. Cir. 2003); *Rapaport v. Dep't of Treasury*, 59 F.3d 212, 216–17 (D.C. Cir. 1995). On occasion, the court has viewed the NWPA as the type of statutory scheme where *Chevron* deference is due. *See Ind. Mich. Power Co. v. DOE*, 88 F.3d 1272, 1274 (D.C. Cir. 1996); *Gen. Elec. Uranium Mgmt. Corp. v. DOE*, 764 F.2d 896, 907 (D.C. Cir. 1985); *see also Public Citizen v. NRC*, 901 F.2d 147, 153–54 (D.C. Cir. 1990). Both the NRC and DOE, however, are responsible for implementing the federal interim storage program under Subtitle B of the NWPA. *See* 42 U.S.C. §§ 10151–10157; *see also id.* § 10101. The question of whether *Chevron* deference applies to the NRC's interpretation of § 10155(h) is moot here because the result is the same whether the court applies *de novo* review, deference under *Skidmore v. Swift & Co.*, 232 U.S. 134 (1944), or *Chevron* deference, *see Collins*, 351 F.3d at 1254; *Bd. of Trade of City of Chicago v. SEC*, 187 F.3d 713, 719 (7th Cir. 1999) (citing *Dunn v. Commodity Futures Trading Comm'n*, 519 U.S. 465, 479 n.14 (1997)); *Rapaport*, 59 F.3d at 220 (Rogers, J., concurring in part and concurring in the judgment); the text of § 10155(h) as well as the statutory structure and legislative history of Subtitle B of the NWPA support the NRC's interpretation.

## III.

Essentially, Utah's interpretation of § 10155(h) hinges on its view that this provision "expressly disavows" any intent to encourage or authorize private away-from-reactor storage facilities, Petitioners' Br. at 13, and that in order to give meaning to the "notwithstanding" clause it must be read as eliminating prior authority to allow such storage. Utah also looks to the NWPA's structure, noting the protections included for state and local governments where such federal storage is permitted and contends that it would make no sense for Congress to eliminate those protections when storage is private rather than federal. Finally, Utah contends that its interpretation is consistent with congressional concerns about the location of private storage facilities and assurances that

§ 10155(h) was designed to eliminate any basis for those concerns.

In addressing Utah's challenge to the NRC's interpretation of § 10155(h), the court looks first to the language of the statute. *See Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 450 (2002); *Toibb v. Radloff*, 501 U.S. 157, 162 (1991). The structure of the statute is also relevant in understanding Congress's intent. "[I]f the statutory language is unambiguous and the statutory scheme is coherent and consistent," the court's inquiry ceases. *See Barnhart*, 534 U.S. at 450 (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997)) (internal quotation marks omitted). The legislative history can assist the court in identifying legislative intent where the statute is unclear, *see Blum v. Stenson*, 465 U.S. 886, 896 (1984), and, on rare occasions, it may suffice to overcome a result of the plain language of the statute that is "demonstrably at odds with the intentions of its drafters." *United States v. Ron Pair Enterp., Inc.*, 489 U.S. 235, 242 (1989) (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571 (1982)); *see also Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1088–89 (D.C. Cir. 1996).

The text of § 10155(h), read in light of Subtitle B of the NWPA, demonstrates that Congress did not intend to repeal or supersede the NRC's authority under the AEA to license and regulate private use of private away-from-reactor spent fuel storage facilities. Section 10155(h) itself contains no prohibitory language, and, as Utah conceded at oral argument, the NRC had authority under the AEA to regulate private away-from-reactor storage facilities. In providing that "nothing *in this chapter* shall be construed to . . . authorize" private storage facilities, 42 U.S.C. §§ 10155(h) (emphasis added), Congress limited the scope of the NWPA, but left untouched prior and subsequent statutes that authorized such facilities. As the NRC rests its authority to regulate and authorize private away-from-reactor facilities on the AEA, a provision limiting the effects of "this chapter" could not undermine that authority, if at all, without some fairly unusual accompanying language or context. Section 10155(h) makes no mention of either the AEA, although that

statute is mentioned elsewhere in the NWPA, *see, e.g.*, 42 U.S.C. §§ 10153(a), (b)(3), 10155(a)(1)(A)(i), or the NRC's regulations at 10 C.F.R. Part 72, of which Congress was aware. *See* S. Rep. No. 97–282, at 44 (1981); *see also Medtronic, Inc. v. Lohr*, 518 U.S. 470, 491 (1996); *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 729 (1989). Given that Congress was aware of the NRC's regulations for licensing private away-from-reactor storage facilities, the plain language of § 10155(h) provides no support for Utah's conclusion that Congress "expressly disavow[ed]" use of private away-from-reactor storage facilities or silently meant to repeal or supersede the NRC's authority under the AEA. *See Morton v. Mancari*, 417 U.S. 535, 550–51 (1974). It is a "cardinal rule [of statutory construction] that repeals by implication are not favored*.*" *Id.* at 549 (internal quotation marks omitted). This canon is no less applicable when the original grant of authority is implicit rather than express.

To the extent that the words of § 10155(h) derive contextual meaning, the statutory structure demonstrates that the more reasonable reading of § 10155(h) is that it sets forth the limits of the NWPA. As the NRC explained, when viewed in light of the whole of Subtitle B, each word of § 10155(h) has its own significance. *See Rulemaking Order*, 56 NRC at 397–99. In not "authoriz[ing]" private storage facilities, Congress intended to limit the scope of the NWPA. DOE's authority originated with the NWPA, and therefore, the NWPA's failure to "authorize" storage at private facilities resulted in restricting DOE's powers to take over a private facility to fulfill its NWPA obligations. The NRC's authority, however, originated with the AEA, and nothing in the text of § 10155(h) suggests that Congress intended to repeal this authority. Although it may have been unnecessary for Congress to add that the NWPA does not "encourage" or "require" DOE to use private facilities, it was necessary for Congress to use such terms in describing the preconditions on private generators for obtaining federal interim storage; provisions in Subtitle B "encourage" private onsite storage, and inclusion in § 10155(h)'s introductory clause of the phrase "[n]otwithstanding any other provision of law" eliminated

reliance on a prior draft of § 10155 that "require[d]" private generators to exhaust private away-from-reactor options before requesting federal interim storage. Once each word of § 10155(h) is given a role in Subtitle B, it reasonably follows, as the NRC pointed out, that § 10155(h) is "facially neutral: neither prohibiting nor promoting the use of private [away-from-reactor] storage facilities." *Id.* at 407.

Contrary to Utah's position, the NRC's interpretation of § 10155(h) does, in fact, give full meaning to Congress's use of the word "authorize." In light of the role of that word in Subtitle B, there is no reason to conclude that Congress intended in relatively obscure terms for the NWPA's failure to "authorize" such storage to repeal or supersede the NRC's preexisting authority under the AEA to license storage of spent fuel at private away-from-reactor facilities. The NRC's interpretation also gives full meaning to the other words of § 10155(h) in light of Subtitle B. To the extent that Utah maintains that the NRC's interpretation creates a "big anomaly" between the NWPA's system of allowing federal away-from-reactor facilities that are capacity-limited and subject to numerous restrictions and the AEA's regulatory system of permitting private away-from-reactor facilities of unlimited size and without any of the restrictions imposed on federal facilities, *see* Petitioners' Br. at 31–36, Utah ignores that private away-from-reactor storage was already regulated by the NRC under the AEA prior to the NWPA. It was not an anomaly for the NWPA to focus on regulating those "supplements" that the NWPA itself added, namely federal storage programs, and to leave the pre-existing regulatory scheme as it found it. *See* 42 U.S.C. §§ 10131, 10151; S. Rep. No. 97–282, at 1 (1981). In the absence of irreconcilability between the AEA and the NWPA, there is no basis to conclude that in enacting the NWPA Congress implicitly repealed or superseded the NRC's authority. *See Morton*, 417 U.S. at 550–51 (1974); *Whitman v. Am. Trucking Ass'n, Inc.*, 531 U.S. 457, 468 (2001).

The legislative history of the NWPA on which Utah relies does not reflect, contrary to the text of § 10155(h), an "express[ ] disavow[al]" of the NRC's authority under the AEA

to license private away-from-reactor storage facilities. The congressional reports and debates referred to by the parties indicate that § 10155(h) represented a compromise of three contested issues: (1) the level of federal involvement in interim storage; (2) federal use for interim storage of private away-from-reactor storage facilities, of which there were three; and (3) political and social limitations on private generators to develop away-from-reactor solutions to spent fuel storage problems. *See* S. Rep. No. 97–282 (1981); H.R. Rep. No. 97–491, pt. 1 (1982); 128 Cong. Rec. 28,032 (1982); *see also* 42 U.S.C. § 10131. Section 10155(h) thus ensured that DOE would not take over private facilities to fulfill its NWPA obligations, and clarified that private generators were not obligated under the NWPA to exhaust all away-from-reactor options prior to receiving federal assistance. Nothing in those reports and debates suggests that Congress intended to prohibit private use of private away-from-reactor facilities.

For these reasons we hold that the NRC's interpretation is more in conformance with the language of § 10155(h) viewed in the context of Subtitle B than that offered by Utah. Accordingly, we deny the petitions for review of the NRC's *Rulemaking Order* and the motion to dismiss as to certain petitioners for lack of standing.