Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued March 9, 2004        Decided April 20, 2004

No. 03-1185

CHARLES E. DUCHEK,
PETITIONER

v.

NATIONAL TRANSPORTATION SAFETY BOARD AND
FEDERAL AVIATION ADMINISTRATION,
RESPONDENTS

On Petition for Review of an Order of the
National Transportation Safety Board

*James E. Ramsey* argued the cause and filed the briefs for petitioner.

*Agnes M. Rodriguez*, Attorney, Federal Aviation Administration, argued the cause for respondents. With her on the brief was *Peter J. Lynch*, Assistant Chief Counsel. *Allan H. Horowitz*, Attorney, entered an appearance.

---

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

Before: GINSBURG, *Chief Judge*, and RANDOLPH and ROBERTS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* ROBERTS.

ROBERTS, *Circuit Judge*: The Federal Aviation Administration revoked Charles Duchek's three airman certificates, basing its action on a finding that Duchek had refused to submit to a required drug test. Duchek argues that he never refused to submit to a test: although he received a letter stating that his name had been randomly selected for testing, the letter did not establish a date and time to report for the test — because, in the typical case, it was Duchek's job to set the date and time for those company employees selected for the unannounced tests. An administrative law judge at the National Transportation Safety Board agreed with Duchek that a test must be scheduled before an airman can be deemed to have refused to submit to it, but the Board reversed, holding that the FAA acted properly in revoking Duchek's certificates. We hold that the applicable regulations do not support the FAA's action, and therefore vacate the Board's order as arbitrary and capricious.

## I.

Duchek is the operator and the co-owner, with his wife, of Midwest Aeronautical Training, Inc., a small company in St. Louis, Missouri that provides helicopter services, including air taxi service and pilot training. As a provider of commuter and on-demand flight services, Midwest holds a certificate under Part 135 of the Federal Aviation Regulations, codified at 14 C.F.R. Part 135. Employers with such certificates must ensure that employees in safety-sensitive positions are tested for illegal drugs, *see* 14 C.F.R. § 135.251(a); a separate section of the regulations, Appendix I to 14 C.F.R. Part 121, establishes the standards for employers' drug testing programs. In addition to pre-employment and post-accident testing, an employer must conduct random testing: in any given year, a certain fraction of the company's employees — generally at least fifty percent — must be selected at random for a drug test. *See* 14 C.F.R. Pt. 121, App. I, ¶ V.C.1, .5–.6

(hereinafter App. I). When an employee has been randomly selected, it is the employer's duty to ensure that the employee's drug test is "unannounced." *Id.* ¶ V.C.7.

For a small business such as Midwest, which has only two employees aside from Duchek himself, the operation of a full-fledged internal drug testing program could be burdensome. Department of Transportation regulations — which apply in addition to the FAA regulations in Appendix I, *see id.* ¶ I.B — accordingly allow an employer to use a "consortium/third-party administrator" (C/TPA) to select employees at random for testing, schedule tests, collect specimens, and arrange for laboratory testing. *See* 49 C.F.R. §§ 40.3, 40.15(a); *see generally* 49 C.F.R. Pt. 40, Subpt. Q. As both the FAA and DOT regulations make clear, however, the employer retains the responsibility for compliance with the testing requirements, even when it hires a C/TPA. App. I ¶ I.C; 49 C.F.R. § 40.15(c).

Midwest hired Clinical Collection Management, Inc. (CCM) as its C/TPA in August 1999. When the drug testing regulations took their current form in August 2001, *see* Procedures for Transportation Workplace Drug and Alcohol Testing Programs, 65 Fed. Reg. 79,462 (Dec. 19, 2000), Duchek took on the newly-created role of "designated employer representative" (DER) for Midwest. *See* 49 C.F.R. § 40.3. Midwest's random drug testing program thereafter involved two steps: CCM would send a quarterly notice to Duchek, as DER, listing the employees selected for testing, along with an individualized notice to be given to each employee. Duchek — in his capacity as DER — would then choose a date and time for each selected employee to report for testing, but would notify the employee only on the chosen date, instructing him to report immediately for testing. The individualized notice forms from CCM thus arrived at Midwest with only blank spaces for the specific date and time of the test; Duchek would fill in a date and time as part of choosing when to spring the drug test on the presumably unsuspecting employee.

On October 1, 2002, CCM selected Duchek and another employee, Jonathan Heslop, from the pool of Midwest employees eligible for testing in the fourth quarter of 2002. In Heslop's case, the system worked as it was supposed to: Duchek chose October 28 as the date for Heslop's test and instructed Heslop on that day to report promptly to CCM. With regard to himself, however, Duchek was somewhat in a bind: he was both the DER and the person to whom the DER was required to give unannounced instructions to report for testing. CCM's solution to this problem, its president later testified, was that a DER such as Duchek should contact CCM immediately upon opening the notification letter to arrange for a test on that day. Hr'g Tr. at 43–44. The test could take the form of a same-day visit by CCM to the DER's workplace, or a scheduled appointment for the DER to come to CCM on that day. *Id.* at 44. In the case of his fall 2002 selection, however, Duchek failed to contact CCM. He later explained to the FAA that a number of disruptive events had occurred in his business at the time and that he "just let the notice slip [his] mind and forgot to follow up." Statement of Events (Feb. 20, 2003), at 1; *see also* Hr'g Tr. at 152–53 (Duchek stating that he knew he was supposed to call CCM to schedule a test but he "mislaid the notice and . . . forgot to call").

The FAA issued an emergency order revoking Duchek's airman certificates on March 20, 2003. As authority for the revocation, the FAA cited 14 C.F.R. § 61.14(b), which states that an airman's refusal to take a drug test as required under Appendix I is grounds for "[s]uspension or revocation of any certificate, rating, or authorization" issued to the airman. 14 C.F.R. § 61.14(b)(2). Appendix I, in turn, defines a "refusal to submit" to a drug test simply as "conduct specified in" the pertinent DOT regulation, 49 C.F.R. § 40.191. App. I ¶ II. That regulation provides, in pertinent part, that an employee has refused to take a test if he:

> Fail[s] to appear for any test . . . within a reasonable time, as determined by the employer, consistent with applicable DOT agency regulations, after being directed

to do so by the employer. This includes the failure of an employee (including an owner-operator) to appear for a test when called by a C/TPA (see § 40.61(a)).

49 C.F.R. § 40.191(a)(1).

At the end of the long chain of cross-references, 49 C.F.R. § 40.61(a) — a provision addressed to C/TPAs and other service agents who collect drug testing specimens — states:

> When a specific time for an employee's test has been scheduled, or the collection site is at the employee's work site, and the employee does not appear at the collection site at the scheduled time, contact the DER. . . . If the employee's arrival is delayed beyond [an appropriate] time, you must notify the DER that the employee has not reported for testing. In a situation where a C/TPA has notified an owner/operator or other individual employee to report for testing and the employee does not appear, the C/TPA must notify the employee that he or she has refused to test (see § 40.191(a)(1)).

49 C.F.R. § 40.61(a).

Duchek challenged the revocation order, arguing that he was not "called" for testing as required by Section 40.191(a)(1) and that he could not be held to have "refused" to take a drug test, because no date and time for the test were ever scheduled. *See* Amended Answer ¶¶ 21–22. At a hearing on April 17, 2003, an NTSB administrative law judge heard testimony from Duchek and two other witnesses: the president of CCM and an FAA investigator, Robert Neal. Neal testified that for a drug test to be random under Appendix I, it must be unannounced. Hr'g Tr. 114. The ALJ found Neal's statement highly significant, and concluded that "there was no random drug test scheduled" for Duchek, because "if there is an announcement, [the test] can't be random, if it is open ended. And here it was open ended." *Id.* at 216–19. The judge thus ruled that the FAA had not established that Duchek had violated the regulations. *Id.* at 219.

The Board reversed:

> It is true that, in a sense, [Duchek's] selection was not unannounced in the same way it was for other employees.... It may be that the Administrator should reconsider the practices of allowing persons subject to testing also to be DERs and not requiring the notice to the DER to contain a time and date or period of time for the scheduled testing. Without the latter specificity, the rules are open to uncertainty in their application and an element of this important program could be the subject of time consuming and unnecessary litigation. In this case, however, we are satisfied that respondent should be held accountable for failing to ever appear for testing.

*Administrator v. Duchek*, NTSB Order No. EA-5040 (May 23, 2003), at 4–5 (Board Order).

The Board reasoned that "as the DER, and owner of the company, [Duchek] had a clear responsibility to comply with the letter and spirit of the antidrug program." *Id.* at 5. It found that Duchek was "obliged to present himself for testing" as soon as he received notice from CCM that he was among those selected for testing that quarter. *Id.* Rejecting Duchek's proffered explanation of why he did not call CCM to schedule the test, the Board stated:

> [T]he responsibility was his, not CCM's. Reminding was not a service CCM provided, nor could it realistically do so. Under the regulations, the service agent may assist the carrier in certain functions, not absolve it of its primary responsibility to maintain a drug-free workplace. Indeed, the quality of the assistance is only as good as the information the client provides.

*Id.*

## II.

Under the FAA's interpretation of the regulations, Duchek was "require[d]..., as the selected employee, to appear as soon as possible after he [was] informed of his selection." FAA Br. at 31; *see also* Board Order at 5 ("[R]ight after he read the ... letter from CCM identifying him as a random

testing subject, he was obliged to present himself for testing."). An agency is ordinarily entitled to "substantial deference" to its interpretation of its own regulations. *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (citing, *inter alia*, *Udall v. Tallman*, 380 U.S. 1, 16 (1965)). Even assuming that the FAA is entitled to deference for an interpretation that encompasses not only FAA regulations, but also DOT regulations applied by other agencies as well, *see Collins v. NTSB*, 351 F.3d 1246, 1253 (D.C. Cir. 2003), the FAA's interpretation would still not survive, because it is "inconsistent with the regulation" in two significant respects. *Thomas Jefferson Univ.*, 512 U.S. at 512 (internal quotation marks and citation omitted); *cf. Kennecott Utah Copper Corp. v. U.S. Dep't of Interior*, 88 F.3d 1191, 1210 (D.C. Cir. 1996) (court will not resolve whether agency interpretation is entitled to *Chevron* deference because interpretation would not survive even if deference were given).

First, the FAA's interpretation seizes upon a provision of the regulations — the first sentence of 49 C.F.R. § 40.191(a)(1) — that, by its terms, cannot readily be applied to a DER such as Duchek. *See* FAA Br. at 19, 31–32. The provision states that an employee must appear for a drug test "within a reasonable time, *as determined by the employer*, consistent with applicable DOT agency regulations, *after being directed to do so by the employer*." 49 C.F.R. § 40.191(a)(1) (emphases added). It is the DER who carries out the employer function of determining the reasonable time for reporting — the language "within a reasonable time, as determined by the employer" dovetails neatly with the wording of 49 C.F.R. § 40.61(a), which instructs the C/TPA to consult with the DER "to determine the appropriate interval within which the DER has determined the employee is authorized to arrive." And of course it is the DER who carries out the employer function of directing selected employees to report for testing in the first place.

The first sentence of Section 40.191(a)(1) applies quite comfortably to someone in Heslop's position — he is required to appear within a reasonable time after being told by Duchek to report for testing, and CCM should consult with Duchek to

establish exactly when to expect him — but the first sentence does not similarly apply to a selected DER such as Duchek. The FAA argues that the receipt of the selection notice from CCM functioned for Duchek in the same way that a direct order from Duchek to report immediately to CCM functioned for Heslop. But a selection notice and a blank form from a C/TPA cannot be considered a "direct[ion] . . . by the employer" equivalent to an order from a DER given — along with a form that has been filled in to indicate a specific date and time — to an employee. Nor, in such a case, is there any mechanism for the C/TPA to find out what constitutes "a reasonable time, as determined by the employer," for the DER to appear for the test. CCM could coordinate with Duchek to find out the appropriate period within which a test for Heslop would be timely, but would have no one to contact at Midwest regarding Duchek's own test.

The second sentence of 49 C.F.R. § 40.191(a)(1), referring to a failure "of an employee (including an owner-operator) to appear for a test when called by a C/TPA (see § 40.61(a))," initially looks more promising, since it specifically addresses testing of owner/operators such as Duchek and the involvement of C/TPAs. The FAA, however, chose not to rely on that sentence, declaring that it "does not apply on the facts of this case," FAA Br. at 31–32, apparently because the cross-reference to Section 40.61(a) renders it applicable only to cases where an individual's test has actually been scheduled. *See id.* at 28. CCM did not schedule Duchek's test — the individualized form it sent for his test had the date and time to report left blank, just like all the other forms.

The FAA defends its reliance on the first sentence of Section 40.191(a)(1) by arguing that the foregoing difficulties disappear if it is understood that the DER must contact the C/TPA to schedule an immediate test as soon as he sees that his name has come up for random testing that quarter. Such an understanding, the FAA argues, is implicit in a sensible reading of the regulations. Oral Arg. Tr. at 20–21; *see also* Board Order at 5 (FAA interpretation is "the obvious conclusion if the testing program is to have any integrity"). But the FAA's rejoinder simply brings forth another inconsisten-

cy with the regulations: the FAA's interpretation is inconsistent with the requirement in Appendix I that "[e]ach employer shall ensure that random drug tests . . . are unannounced." App. I ¶ V.C.7. Only by granting the assumption that a DER will always immediately contact the C/TPA to schedule his test upon opening the letter selecting him for one can the requirement that the DER's test be unannounced be satisfied. *See* Hr'g Tr. at 135 (Neal testimony) ("When [notice of selection] is received in the mail, the only way it would be unannounced is if [the DER] went as soon as he opened up the mail.").

As the ALJ observed, however, under the FAA's view a DER can simply claim to have opened the notice later than he actually did. Hr'g Tr. at 218 (requirement that DER call when he receives selection notice "leaves so many loopholes that it is almost frightening, because all a person has to do is say, hey, I didn't open the mail until Friday, when in fact they opened it Monday, and they didn't do drugs all week, so that just defeats the purpose"). Indeed, a DER who recognizes an envelope from a C/TPA — and perhaps appreciates that it is the first week of the quarter, when random selections are made — would not even have to lie about when he opened the envelope: he could simply set it aside long enough to allow any traces of illegal drugs to leave his system. The FAA's interpretation not only requires a hypothetical drug-using DER to call and schedule a (presumably fateful) test immediately upon opening a selection notice, but requires him to do so to comply not with the letter of the regulations, but with their "spirit." FAA Br. at 39; Oral Arg. Tr. at 32.

The Board was willing to indulge the assumption underlying the FAA's interpretation, *see* Board Order at 5 n.6 ("Contrary to the [ALJ], we will not assume the likelihood of DER cheating."), but we are not. A sport such as golf can have a system of rules grounded on the assumption that participants will in good faith call penalties on themselves, but such an approach seems ill-advised when it comes to designing regulations to protect the public from drug use by those in safety-sensitive positions — and in fact that is not the approach reflected in these regulations. Indeed, the FAA's

assumption flies in the face of the entire regulatory scheme, which specifically requires drug tests to be random, unannounced, and spread throughout the year, *see* App. I ¶ V.C.7, precisely because some employees — including DERs — may attempt to evade their tests. The regulations foreclose any assumption that a DER who is already using illegal drugs will nonetheless handle his own selection notice with impeccable scrupulousness and truthfulness — to his inevitable and substantial detriment.

The FAA argues that its action has a basis in NTSB precedent, relying on *Administrator v. Wright*, NTSB Order No. EA-4895 (May 17, 2001), 2001 WL 540575. In *Wright*, the FAA revoked the certificates of a mechanic who left work before the scheduled end of his shift after being told that he had been selected for drug testing and that the test would occur in forty-five minutes. *Id.* at *1. As the FAA points out, the Board in *Wright* reasoned that there was "nothing in the record which indicates that respondent was unaware that he had been selected, in accordance with FAA requirements, for random drug screening." *Id.* at *2. The FAA argues that the same is true here: the record unequivocally indicates that Duchek knew his name had been randomly selected for a drug test. FAA Br. at 38–39. But it is overwhelmingly clear that the Board in *Wright* used the word "selected" to encompass both the random selection of Wright for testing and the scheduling of the test for that day. *Wright* thus provides no support for the Board's decision to revoke Duchek's certificates.

Even if we assume arguendo that the enforceable "spirit" of the regulations required Duchek to call CCM immediately to schedule his own test, FAA Br. at 39, any failure to do so would be a failure as a DER, not as an individual airman. The regulations provide no basis for revoking the certificates of an individual airman when his employer or DER fails to schedule a random drug test for him. Moreover, as the FAA conceded at oral argument, the regulations would not penalize a DER for failing to schedule an employee's test. If Duchek had failed to schedule a test for an employee such as Heslop, Duchek would not have faced the revocation of the certificates

that he held as an individual. Oral Arg. Tr. at 28–29. Indeed, the employer is "responsible for all actions of [its] officials, representatives, and service agents" in carrying out the FAA and DOT drug testing requirements. App. I ¶ I.C.

Duchek has thus consistently argued that Midwest, rather than he, should be held responsible for his failure to be tested. *See* Amended Answer at 7 ¶ 27; Hr'g Tr. at 141, 174; Pet. Br. at 16–17. In response, the FAA argues that Duchek "cannot hide behind Midwest as an excuse for his failure as an employee to submit to required drug testing," and that Duchek's position rests on "formalistic distinctions between himself as DER for Midwest and himself as a . . . safety-sensitive employee." FAA Br. at 16, 37.

The distinction may be formalistic to a degree, but it — unlike the FAA's position — has a basis in the regulations, as just noted, and in NTSB precedent. In *Administrator v. Diaz–Saldana*, NTSB Order No. EA-165 (June 3, 1970), 1970 WL 9437, the Board discussed "whether it is appropriate to apply a sanction to the airman certificate because of a violation committed as an operator." *Id.* at *2. Diaz–Saldana's company had operated approximately 100 flights in violation of applicable regulations; because the airman had personally served as a crew member on only two of the flights, however, the Board determined that his "conduct reflect[ed] more directly on his fitness as an operator than on his qualifications to hold an airman certificate," and decided not to revoke his pilot certificate. *Id.* at *3. In a later case involving the same operator, the Board reiterated that "the fact that the respondent was acting in his capacity as an operator rather than a pilot . . . ha[s] a significant bearing on the question of sanction." *Administrator v. Diaz–Saldana*, NTSB Order No. EA-337 (June 7, 1972), 1972 WL 17060, at *3.

The Board's opinion upholding the FAA's interpretation frequently ignores the distinction between Duchek and his company. In a single paragraph central to its analysis, for example, the Board states that "the responsibility [for calling to schedule a test] was his, not CCM's" and that "the service agent may assist the carrier in certain functions, not absolve

it of its primary responsibility to maintain a drug-free workplace." Board Order at 5. Under the regulations, however, the responsibility for calling to schedule a test was the DER's — thus Midwest's — and Duchek, as an airman, is not a Part 135 "carrier" (or an "it") responsible for implementing an adequate drug testing program. The legally significant distinction between Duchek's airman certificates and Midwest's operating certificate — which is evident in the regulations and in the *Diaz-Saldana* cases — disappears in this portion of the Board's opinion. To the extent, however, that the C/TPA arrangement between Midwest and CCM was flawed — in that it did not require CCM to assume scheduling responsibilities when a DER was selected for testing, or otherwise address the problem of selecting and scheduling a DER for testing consistent with the regulations — the blame for that lies with Midwest or CCM or both, not with the DER as an airman.[1]

\* \* \*

As the NTSB admitted in this case, the obligations of DERs under the regulations are unclear. The Board ultimately found that it was "satisfied" that Duchek should be held accountable, but it reached that level of satisfaction only by invoking the "spirit" of the regulations, by accepting an FAA interpretation that is inconsistent with the text and purpose of the regulations, and by arbitrarily targeting Duchek's individual airman certificates when the governing regulations — and analogous precedent — indicate that employers should bear the responsibility for carrying out the FAA's drug testing requirements. The Board's action violates the Administrative Procedure Act as "arbitrary, capricious, . . . or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), and we now set it aside. The petition for review is granted and the Board's order is vacated.

---

[1] In light of our conclusion that the FAA's action in this case was inconsistent with the regulations, we need not and do not address Duchek's argument, *see* Pet. Br. at 24–29, that the regulations, as interpreted by the FAA, were unconstitutional as applied to him.