165 F.3d 935
 334 U.S.App.D.C. 148
 NORTHERN MUNICIPAL DISTRIBUTORS GROUP, Petitioners,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Terra International, Inc., et al., Intervenors.
 Nos. 97-1457, 97-1492.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Nov. 3, 1998.
Decided Jan. 26, 1999.
 
 On Petitions for Review of Orders of the Federal Energy Regulatory Commission.
 Thomas C. Gorak argued the cause and filed the briefs for petitioners Northern Municipal Distributors Group and Midwest Region Gas Task Force Association. Carl W. Ulrich entered an appearance.
 Frank X. Kelly argued the cause for petitioner Northern Natural Gas Company. With him on the briefs were Steve Stojic, Franklin R. Bay and Dari R. Dornan.
 Andrew K. Soto, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. On the brief were Jay L. Witkin, Solicitor, and Susan J. Court, Special Counsel.
 Carolyn Y. Thompson argued the cause and filed the brief for intervenor Minnegasco, a Division of NorAm Energy Corporation.
 Frank X. Kelly, Steve Stojic, Franklin R. Bay, Dari R. Dornan and Carolyn Y. Thompson were on the joint brief for intervenors Northern Natural Gas Company and Minnegasco, a Division of NorAm Energy Corporation.
 Before: RANDOLPH, ROGERS and TATEL, Circuit Judges.
 Opinion for the Court filed by Circuit Judge ROGERS.
 ROGERS, Circuit Judge:
 
 
 1
 The Federal Energy Regulatory Commission sought in five orders to ensure adequate supplies of gas at Carlton, Minnesota on the Northern Natural Gas Pipeline. A settlement agreement, as modified by the Commission, requires that some shippers supply gas at Carlton and other shippers pay a surcharge to reimburse the supplying shippers. Petitioner Northern Natural Gas ("Northern") contends that it should be permitted to discount the Carlton surcharge in its contracts with customers as it sees fit. Northern maintains that the Commission's decision to limit its ability to discount the surcharge is not well-reasoned, upsets the delicate balance of the settlement agreement, erroneously relies on an inapplicable standard that governs only transition costs, ignores existing policy on discounting of non-transition costs, and ultimately forces Northern to bear the cost of the surcharge despite the principle adopted by the Commission that Northern should act only as a conduit for distributing costs among shippers. Petitioner Northern Municipal Distributors Group ("NMDG") challenges the denial of an exemption from the surcharge, contending that the Order 636 "Global Settlement" expressly exempts small customers like NMDG from all pro rata receipt point allocations occasioned by Order 636 restructuring, and that the Commission has established a policy of exemption for small customers. Because we conclude that the Commission's orders address an operational problem in a well-reasoned manner and NMDG's arguments for exemption fail, we deny the petitions.
 
 I.
 
 2
 After Northern unbundled its transportation and sales services pursuant to the restructuring requirements of Order 636,[1] Northern and its customers had to decide how to allocate receipt point capacity among the customers. Certain receipt points were more popular than others because gas supplies were cheaper; thus demand at those points was higher. Additionally, certain receipt points require input in order to ensure that gas can be delivered throughout the system serviced by a pipe. Along the Northern pipeline a problem arose when the Farmington, Minnesota receipt point was over-subscribed, causing a bottleneck, while a point one hundred miles north at Carlton, Minnesota was under-subscribed. The concerned parties contemplated two solutions: build facilities to relieve the bottleneck at Farmington or increase inputs at Carlton to ensure sufficient supply at the more northern point.
 
 
 3
 The parties entered into interim agreements but eventually came to the Commission for a final solution. Northern proposed four alternatives, two of which involved some or all shippers, excluding small customers, being required to source at Carlton and two of which involved building facilities. In the first order under review, the Commission, noting that "this is a highly contentious issue," resolved that sourcing at Carlton rather than building facilities would be the preferred solution. 76 FERC p 61,180, at 62,000 (1996). The Commission observed that the parties seemed to agree that the Carlton Resolution, "whereby sufficient volumes would be available to meet Northern's contractual delivery obligations north of Farmington, is less expensive, and, thus, preferable to Northern building additional facilities to relieve the Farmington bottleneck." Id. Accordingly, shippers would be required or encouraged to source their gas at Carlton. Because the required sourcing at Carlton was "in lieu of building additional facilities," the costs of solving this systemic problem would be borne by all shippers. Id. at 62,001. Because it was inefficient to require all shippers to source at Carlton, especially if they already had receipt and delivery points south of Farmington, the Commission reasoned:
 
 
 4
 The most efficient solution is to require only the shippers most directly affected, those ... downstream [i.e. north] of Farmington, to source gas at Carlton on a pro rata basis. These shippers should then be compensated by the other shippers on Northern's system for the additional costs they incur because they must buy the higher priced gas for delivery at Carlton.
 
 
 5
 Id. Regarding the small customers, the Commission noted that although these entities could encounter operational problems in sourcing small quantities, they had the options of assigning their sourcing obligations to other shippers and/or amalgamating their responsibilities into larger buying blocks. In any event, the Commission saw no reason why small shippers "or any other shipper should not shoulder its proportionate share of the costs of [the Carlton problem]." Id.
 
 
 6
 In the second order, the Commission addressed the various exemptions sought by parties in response to Northern's filing of proposed tariff sheets and a draft of a Carlton Resolution that was not the product of an agreement between the affected parties. See 77 FERC p 61,022 (1996).[2] Rejecting a small customer exemption, the Commission explained that the Global Settlement on restructuring under Order 636, see 64 FERC p 61,073 (1993), determined that certain shippers would not have a pro rata allocation at every receipt point because "small customers [should] not be allocated an unusable sliver of capacity at many receipt points." 77 FERC at 61,081. As a result, small customers, unlike other shippers, could have all of their capacity at one point. However, the Commission distinguished between the broad policy of allocation associated with restructuring and the particular problem of system integrity at Carlton. The Carlton-type problem could arise only in a certain part of the year at one particular receipt point. Under "these limited circumstances," the Commission concluded that small customers would not be "unduly burdened in assisting to ensure that their own services continue to be provided." Id.
 
 
 7
 As to Northern's customers' concerns about discounts and the effect of the Carlton surcharge, the Commission decided that Northern could collect the surcharge from a shipper unless specifically prohibited by Northern's contract with that customer.[3] See id. at 61,083. Further, if Northern did discount its rates, it would be required to reflect discounts to the Carlton surcharge after base rates but before transition costs. See id. The Commission applied the reasoning of its decision in Natural Gas Pipeline Company of America, 69 FERC p 61,029 (1994) ("Natural"), which established that discounts would be attributed to transition costs last.[4] The Commission thereby prioritized which costs would be deemed recovered and increased the likelihood that shippers forced to source at Carlton would be reimbursed.
 
 
 8
 The Commission rejected Northern's "deviations" from the guidelines set forth in its previous order, concluding that Northern did not meet the guidelines when it decided to require all market area shippers--rather than only those shippers downstream of Farmington--to receive the necessary volumes at Carlton. 77 FERC at 61,084-85. This arrangement was contrary to the requirement that the fewest number of shippers and only those nearest Carlton would receive gas there, see id. at 61,085, because it would enable Northern to avoid its duty to compensate one class of shippers for the cost of sourcing at Carlton. The Commission also rejected Northern's attempt to exempt various classes of customers as undercutting the goal that the Carlton Resolution have the same effect as new construction. See id. The Commission likewise was unpersuaded by Northern's complaints that a reimbursement system was unworkable because it was too difficult to determine incremental cost and the appropriate timing of the reimbursement. See id. at 61,086.
 
 
 9
 Thereafter, Northern and its customers, save one, reached a settlement supported to varying degrees by the parties affected. The proposed settlement would obligate certain market area customers to source at Carlton based on their current entitlement. These shippers could source or participate in a bidding process whereby they would opt out of their obligation to source; a "Carlton Account" would settle the costs of sourcing amongst these shippers. Shippers not obligated to source at Carlton would pay a surcharge of $0.04 that Northern would recover only where it could contractually collect the surcharge; the amount collected would be reimbursed on a pro rata basis to the shippers who sourced at Carlton. Small customers had the option to buy out of their sourcing obligations at a rate of $.60 multiplied by their daily sourcing obligation and a specified number of days.
 
 
 10
 Numerous parties filed comments to the settlement. Minnegasco, the largest resale customer on Northern's system, urged the Commission to reject the settlement for four reasons: first, the fixed surcharge was "not the equivalent of the true-up reimbursement mechanism ordered by the Commission;" second, the settlement would "allow non-sourcing shippers to escape all financial responsibility for the surcharge;" third, the implausibility of reimbursement was heightened by Northern's insertion of a clause that permitted it to "contract away" its ability to collect the surcharge; and fourth, both the small customer buyout and the surcharge for non-sourcing shippers would prove inadequate to cover the actual cost to the sourcers at Carlton. Minnegasco suggested that rather than predetermining that shippers north of Farmington would source at Carlton and those south would not, the Commission should permit shippers south of Farmington to choose between sourcing or paying the surcharge. Northern Illinois Gas, another shipper on Northern's pipeline, also expressed concern that Northern might be able to "discount away" collections from non-sourcing shippers, but supported the compromise over a solution imposed by the Commission, so long as the Commission clarified that the discounting issue could be addressed in the next general rate case. NMDG maintained that small customers were "exempt from any Carlton receipt point allocation, reallocation, or obligation," citing the Global Settlement concerning Order 636 restructuring, which gave these customers the "right to choose and utilize a single primary receipt point on a permanent basis," and established that for purposes of allocating receipt point capacity, their receipt point requests would be honored in full and other converting sales customers would be allocated capacity on a pro rata basis.
 
 
 11
 In the third order, the Commission approved the settlement with one modification to the surcharge discounting provision. See 77 FERC p 61,201 (1996). Reiterating that Natural applied, and thus the Carlton surcharges must be discounted after the base rate, see id. at 61,786, the Commission reaffirmed that Northern was to be merely a conduit of the Carlton costs between shippers, and therefore, it would not be required to bear any of the Carlton costs unless it chose to do so by offering discounts, see id. at 61,787. Recognizing that Northern would bear some cost if it discounted significantly, the Commission applied Natural in an effort to "discourage Northern from shifting costs among the parties to its settlement after the settlement has taken effect."[5] Id. In rejecting the small customer exemption, the Commission observed that the Global Settlement could not be used to apply in every situation, and concluded that "the settlement reaches a suitable middle ground between the forces that would require small customers to share the same burdens as all other Northern shippers, and those that would call for small customers to enjoy the benefits of a Carlton resolution without contributing at all." Id. at 61,788.
 
 
 12
 Northern objected, noting that the parties to the settlement had agreed that Natural's application to the Carlton surcharge would not be addressed until Northern's next rate case, "an essential element of the bargain for Northern," and that the settlement incorporated each party's understanding that the sourcing shippers would only recover what Northern could collect and no more.[6] Therefore, in Northern's view, "there is no 'cost' to shift among the parties," and further, the Commission's decision would cause Northern to pay some of the costs of solving the Carlton problem, a result the Commission claimed it did not desire. If the Commission refused to reinstate the surcharge policy from the settlement, Northern requested that the Commission either clarify that Natural's discounting rule would apply only prospectively, or design a compensation mechanism that would ensure that Northern would bear none of the costs, for example by setting a charge to be collected separately from a shipper's contract with Northern.
 
 
 13
 In the fourth order, the Commission abandoned application of Natural,[7] but repeated that its basic goal was "to ensure that the Carlton costs are shared fairly among all of Northern's shippers." 79 FERC p 61,348, at 62,488 (1997). Northern's plan to reimburse sourcing shippers only insofar as it collected the surcharge from other shippers remained unacceptable. While discounts permit pipelines to increase their "throughput," and increased throughput is generally encouraged, "Northern had increased its throughput by allowing a shipper to escape paying its portion of the Carlton costs at the expense of shippers like Minnegasco that were paying the Carlton costs." Id. The Commission was concerned that the shippers obligated to source at Carlton could not be parties to Northern's agreements to discount other shippers' rates and thus had no "protect[ion] from having their reimbursement amounts given away by Northern." Id. The Commission therefore continued to require that any discounts would be deemed to come from Northern's base rates before the Carlton surcharge. See id. at 62,489. In the Commission's view, Northern would act as a conduit that would not bear the Carlton surcharge costs unless it "deeply discount[ed] its rates," and then it would be "only reasonable" for Northern, rather than other shippers, to bear the costs of its choice. Id.
 
 
 14
 In response, Northern argued that the Commission could not maintain its stance on discounting in view of its admission that Natural was inapplicable and its discounting policy in other contexts, and that the Commission should approve the settlement agreement. In the fifth order, the Commission denied rehearing. See 80 FERC p 61,148 (1997). These petitions for review of the five orders followed.
 
 II.
 
 15
 Two statutes control our review of the Commission's orders. First, under the Administrative Procedure Act, the court must hold unlawful and set aside agency actions, findings, and conclusions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2) (1994). Upon examining the record the court inquires whether it can discern a rational connection between the facts found and the choice made by the Commission, and whether the Commission has considered all the relevant factors and provided an adequate explanation to support its decision. See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 42-43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); Greater Boston Television Corp. v. FCC, 444 F.2d 841, 850-53 (D.C.Cir.1970). The court can rely only on the reasons supplied by the agency to justify its action. See State Farm, 463 U.S. at 43, 103 S.Ct. 2856; SEC v. Chenery Corp., 332 U.S. 194, 196-97, 67 S.Ct. 1575 (1947).
 
 
 16
 Second, under the Natural Gas Act, the Commission's findings of fact are "conclusive" on appellate review if "supported by substantial evidence." 15 U.S.C. § 717r(b) (1994). Congress granted the Commission authority to determine just and reasonable policies and practices affecting rates, charges, or classifications in connection with the transportation or sale of natural gas under Section 5 of the Act. See id. § 717d. Thus, "judicial scrutiny under the Natural Gas Act is limited to assuring that the Commission's decisionmaking is reasoned, principled, and based upon the record." Pennsylvania Office of Consumer Advocate v. FERC, 131 F.3d 182, 185 (D.C.Cir.1997), corrected by 134 F.3d 422 (D.C.Cir.1998) (quotation marks and alterations omitted); see also Koch Gateway Pipeline Co. v. FERC, 136 F.3d 810, 814 (D.C.Cir.1998).
 
 A.
 
 17
 Northern Natural Gas: Discounting. Northern contends that the Commission's discounting policy is not the product of reasoned decision making for two reasons. First, the Commission erroneously applied its decision in Natural governing transition costs and failed to follow its precedent and previous practices for non-transition costs. Second, the Commission's policy does not achieve the purported goals of the surcharge: to guarantee that shippers pay their fair share, to ensure that shippers sourcing at Carlton are fully reimbursed, and to make Northern a mere conduit for the surcharges. As a related matter, Northern contends that the Commission did not give adequate consideration to the settlement agreement.
 
 
 18
 Northern maintains that precedent and practice permit Northern to elect when and how to discount non-transition costs.[8] It first contends that the Commission's discounting decision deserves no deference by the court because the Commission erroneously applied Natural. The court has reasoned that the Commission's reliance on a "concededly mistaken construction" of one of its precedents, "removes the usual presumption of deference that attends administrative decisions made in the exercise of the agency's delegated authority." Tennessee Gas Transmission Co. v. FERC, 789 F.2d 61, 62-63 (D.C.Cir.1986). But there would be no point in penalizing the Commission for correcting its mistakes, much less in finding disparate treatment of similar situations to be arbitrary and capricious, so long as the Commission provides a reasoned foundation for its current decision. See Williams Natural Gas Co. v. FERC, 3 F.3d 1544, 1550-54 (D.C.Cir.1993). Thus, we will not deny deference to the Commission's discounting decision on the sole basis that it applied a prior precedent it later found to be inapplicable. The Commission has consistently articulated the principle that all shippers should share in the Carlton costs. Simply because the Commission recognized that Natural did not apply did not mean that the only reasoned decision that remained was to implement Northern's discounting plan. A decision to prevent Northern from shifting the fair distribution of costs among shippers could be well-reasoned even without the application of Natural.
 
 
 19
 Northern next contends that the Commission's decision in Panhandle Eastern Pipeline Co., 75 FERC p 61,004 at 61,012-13 (1996), established a policy that governs discounting of all non-transition costs from which the Commission inexplicably deviated. In Panhandle, which discussed miscellaneous costs, the Commission explained that the Natural policy established a priority of discounting for transition costs and clarified that non-transition reservation charges would be attributed as agreed by the parties. Discounts could be attributed either before or after base rates. But the Commission persuasively maintains that Panhandle did not create a policy governing all non-transition costs or contemplate the unique costs stemming from the Carlton operational problem. In the Commission's view the Carlton surcharge discounting policy is a new policy for a new situation.
 
 
 20
 Even if we were to conclude that the Commission could have considered treating the Carlton surcharge like nontransition costs, it does not follow that it was required to do so. That Natural and Panhandle distinguished between transition costs and non-transition costs does not establish a policy that all non-transition costs are to be treated the same. Given the systemic nature of the Carlton problem and the legitimate goal that all shippers share in the cost, the Commission was not required under its prior orders to allow Northern to discount the Carlton surcharge in any way it chose. The departure cases on which Northern relies, see, e.g., ANR Pipeline Co. v. FERC, 71 F.3d 897, 901 (D.C.Cir.1995), are therefore inapposite.
 
 
 21
 Northern also contends that the structure and amount of the surcharge fail to advance the Commission's purported purposes. First, under the current policy, Northern maintains, it will inevitably bear some of the Carlton costs, contrary to the Commission's view that Northern should be "merely a conduit" for the Carlton surcharges. 77 FERC at 61,787. In Northern's view, it was the Commission's goal to have Northern bear some of the costs; in a later, unrelated proceeding the Commission stated that Northern should bear the risk for any discounting of Carlton costs because Northern controlled the decision not to build new facilities. See Northern Natural Gas Co., 81 FERC p 61,411, at 62,864 (1997). Thus, in Northern's view, the Commission's decision is flawed because it either imposes costs contrary to the Commission's stated goals or imposes costs as the Commission intended, but did not inform Northern during the Carlton proceedings.
 
 
 22
 Second, it is unnecessary for Northern to act as a "conduit" for the surcharge because the Carlton costs could be recovered from the responsible shippers directly. Northern contends that the Commission has failed to design an appropriate mechanism that would successfully reimburse shippers for their added cost of sourcing at Carlton. In addition, Northern maintains that the $0.04 surcharge, first created in the negotiated settlement, was arbitrarily adopted by the Commission without support for the proposition that the surcharge would allow full reimbursement. Northern also maintains that the Commission's view that the discounting policy will result in each shipper paying its share is a fiction; if a shipper has a discounted rate, it will pay that same rate no matter what the surcharge and Northern will bear that cost.
 
 
 23
 Although Northern raises legitimate concerns, it does not follow that the Commission's determination was arbitrary or capricious and not the product of reasoned decision making. The Commission was faced with the "highly contentious" issue of how customers would bear the Carlton costs. The parties' settlement was contested by the largest sourcing customer at Carlton. Under the circumstances, the Commission could decide the merits of the contested settlement issue, and be affirmed so long as the record contains substantial evidence upon which to base a reasoned decision. See 18 C.F.R. § 385.602(h)(1). The Commission took note of Northern's concerns, pointing out that Northern listed only two contracts, which did not represent much of its transportation volume, where it offered Carlton discounts, and that Northern has the opportunity in its next rate case to make a showing of the Carlton costs it has borne. The record therefore supports the Commission's reasoned determination that the settlement, combined with a restricted discounting policy, will best serve the public interest.
 
 B.
 
 24
 Northern Municipal Distributors Group: Small Customer Exemption. NMDG contends that small customers were exempted from any and all receipt point capacity allocations by express agreement, and alternatively, that the Commission has established a policy regarding small customers from which it cannot deviate.
 
 
 25
 In the Global Settlement, the unbundling of services pursuant to order 636 restructuring required allocation of receipt points. Receipt point capacity would be allotted first to converting sales customers who would submit nominations for capacity. If the nominations exceeded available capacity, then Northern would first allocate to small customers and then allocate on a pro rata basis to all other converting sales customers. Under the settlement, small customers were exempt from the rules generally applicable to other sales customers.
 
 
 26
 NMDG interprets the Global Settlement to govern all receipt point capacity allocation issues that arise in relation to restructuring. Under NMDG's theory, the receipt point allocations at Carlton are governed by the same provision of the Global Settlement. The Commission disagreed, finding that no prior agreement entitled small customers to an exemption from the Carlton receipt point allocation. Once the Commission has approved a settlement, the court will defer to the Commission's interpretation of it, see Western Resources, Inc. v. FERC, 9 F.3d 1568, 1576-77 (D.C.Cir.1993); National Fuel Gas Supply Corp. v. FERC, 811 F.2d 1563, 1568-72 (D.C.Cir.1987); and we find no reason not to do so here.
 
 
 27
 The Commission adequately supports its interpretation of the Global Settlement. If the Global Settlement covered any and all receipt point capacity allocations related to or arising out of Order 636 restructuring, it would bind in perpetuity all parties with respect to problems and situations unknown and unforeseen when the agreement was created. As the Commission explained, the Carlton problem is different than the problem that gave rise to the Global Settlement. The Global Settlement simply allowed small customers to receive all of their demand at a single point even if that receipt point was over-subscribed; it did not address a systemic problem of capacity at an under-subscribed point. The Commission thus could reasonably conclude that the Carlton problem falls outside the scope of the Global Settlement as a systemic problem in whose solution all shippers must share.
 
 
 28
 As an alternative to an express agreement, NMDG relies on the interim Carlton Resolution and other orders to support its contention that the Commission has established a policy of exemption for small customers. The interim Carlton Resolution exempts small customers from allocation of receipt point capacity at Carlton. See Northern Natural Gas Co., 65 FERC p 61,126 (1993).[9] According to NMDG, because small customers were already exempt under the Global Settlement, the "non-exempt" customers were left to allocate the receipt points on a pro rata basis. However, the Resolution was by its terms expressly interim, and the parties' 1993 settlement stated explicitly that the parties did not intend to establish any precedent for future Carlton operating responsibility. In accepting the interim terms, the Commission made clear that the terms were expected to be in effect for a limited time and that it was not approving the resolution with Northern's sales customers, nor its terms or conditions. See 65 FERC at 61,622.
 
 
 29
 Resolving the Carlton problem, as the Commission explained, is distinct from receipt point capacity allocations as part of restructuring generally. The problem arises in limited circumstances, and small customers have the option to pool their allotted capacity, assign their obligations to other shippers, or buy out of their obligation altogether. The Commission could reasonably conclude that the settlement fairly and appropriately balanced the special interests that small customers have with the responsibilities they should bear.
 
 
 30
 Accordingly, we deny the petitions for review.
 
 
 
 [1]
 See Order No. 636, Pipeline Service Obligations and Revisions to Regulations Governing Self-Implementing Transportation Under Part 284 of the Commission's Regulations, and Regulation of Natural Gas Pipeline After Partial Wellhead Decontrol, III FERC Stats. & Regs. Preambles p 30,939 (1992), on reh'g, Order No. 636-A, III FERC Stats. & Regs. Preambles p 30,950 (1992), on reh'g, Order No. 636-B, 61 FERC p 61,272 (1992), reh'g denied, 62 FERC p 61,007 (1993), aff'd in part and remanded in part, United Distribution Cos. v. FERC, 88 F.3d 1105 (D.C.Cir.1996), on remand, Order No. 636-C, 78 FERC p 61,186 (1997), on reh'g, Order No. 636-D, 82 FERC p 61,210 (1998)
 
 
 [2]
 In the second order, the Commission also noted that receipt point capacity allocation was not the only solution--construction remained a viable alternative--except that the Commission could not order Northern to undertake construction under these circumstances; therefore, a construction solution would have to be negotiated. See 77 FERC at 61,080
 
 
 [3]
 For example, one customer wanted to know whether Carlton costs could be discounted and whether other shippers or Northern itself would be required to absorb any discounts. Another shipper on Northern's pipeline, Terra, argued that it was exempt from the Carlton surcharge because it negotiated discounts with Northern. Because Terra was exempt from this and other surcharges under its contract, the Commission would have had to abrogate the contract in order to assess the charges against Terra--an act that would require finding that the contract rate was so low as not to be in the public interest. See 77 FERC at 61,083. The Commission found that Terra's contract did not prevent it from being required to source volumes at Carlton, but did seem to prohibit Terra from being assessed costs associated with reimbursing other shippers
 
 
 [4]
 In other words, Terra would pay its discounted rate; but under the policy in Natural, that discount would be reflected first in base rates, then in the Carlton surcharge, and last in any transition costs
 
 
 [5]
 The Commission noted that while the current proceedings were pending, Northern had entered into a contract with Terra that exempted Terra from any transition or Carlton costs. The Commission found that Northern had no authority to exempt Terra from the Carlton costs and therefore could not reflect Terra's allocated costs in its computation of the surcharge to be paid by other shippers. The Commission thereby rejected Northern's attempt to "passthrough" the costs to other shippers. 77 FERC at 61,787
 
 
 [6]
 NMDG also objected, but its arguments were repetitive or unrelated to the issues in the instant appeal
 
 
 [7]
 The Commission concluded that because Natural applies to "transition costs ... collected through a surcharge mechanism with a true-up procedure to ensure recovery of the costs" and because there is no true-up or recalculation of costs under the surcharge here, it had "erred in stating that it was applying the Natural policy." 79 FERC p 61,348, at 62,488 (1997)
 
 
 [8]
 Northern also points out that the Commission permitted parties to agree in previous settlements to a method for discounting transition costs that did not follow Natural, and that the proposed permanent resolution merely continued previous practices regarding discounting. However, there was no agreement on the discounting issue in the instant case because Minnegasco has contested Northern's discounting policy from the outset. The Commission was not required to consider prior agreements as a factor in this "contentious" case
 
 
 [9]
 In another order, the Commission explained why small customers were not subject to the same pro rata allocation as other customers:
 Pro rata allocation would result in capacity entitlements in individual segments too small and too burdensome to manage for these [small] customers. Exemption from pro rata allocation for these customers is appropriate given the traditional special treatment afforded such customers and small impact imposed on the rest of the system.
 ANR Pipeline Co., 64 FERC p 61,140, at 62,005-06 (1993).