# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued January 13, 2009          Decided March 17, 2009

No. 07-1532

MICHAEL CHARLES GORMAN,
PETITIONER

v.

NATIONAL TRANSPORTATION SAFETY BOARD
AND FEDERAL AVIATION ADMINISTRATION,
RESPONDENTS

On Petition for Review of an Order of
the Department of Transportation,
National Transportation Safety Board

*Steven A. Ellis* argued the cause for the petitioner. *Catherine V. Barrad* was on brief.

*James A. Barry*, Senior Attorney, Federal Aviation Administration, argued the cause for the respondents.

Before: HENDERSON, TATEL and GARLAND, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: Michael C. Gorman petitions for review of an opinion and order of the National Transportation Safety Board (NTSB or Board), which affirmed a Federal Aviation Administration (FAA) emergency

order revoking Gorman's commercial pilot certificate. The FAA found that Gorman deliberately violated Federal Aviation Regulations (FARs) by operating aircraft carrying cargo for compensation or hire without obtaining the required operating certificate and operations specifications and without complying with competency and line check requirements set out in Subpart C of FAR Part 119, 14 C.F.R. §§ 119.31 *et seq.*, and FAR Part 135, *id.* §§ 135.1 *et seq.*, even after the FAA informed him he was required to do so under FAR section 119.23(b), 14 C.F.R. § 119.23(b). Gorman maintains, as he did below, that the regulation, which on its face applies only to aircraft "having a passenger-seat configuration of less than 20 seats," *id.*, does not apply to his two aircraft because they have no passenger seats and therefore no "passenger-seat configuration" whatsoever. Gorman also asserts that FAR section 119.23, as interpreted by the FAA, is *ultra vires* and that license revocation was too severe a sanction. For the reasons set out below, we conclude that the FAA reasonably construed its regulation to apply to aircraft with no passenger seats, that the regulation is not *ultra vires* and that Gorman has waived his objection to the severity of the penalty. Accordingly, we deny the petition for review.

**I.**

In 2003, Gorman obtained a Part 135 operating certificate to operate his business flying cargo in the form of bank checks for a single bank. In 2005, Gorman decided he did not need a Part 135 certificate to operate his business under the applicable FARs and obtained a written opinion from Robert Griscom, an "aviation attorney," that as a "private carrier" Gorman did not need such a certificate which, Griscom averred, is required only for "common carriers."[1]  *See* Hearing Ex. C-1, *Sturgell v.*

---

[1]A "common" carrier is a carrier "that holds itself out to the public, or to a particular class or segment, as willing to furnish transportation for hire." 14 C.F.R. § 375.40(b). "Noncommon" or

*Gorman*, Docket No. SE-18094, at 2-3 (NTSB Sept. 25, 2007) (July 18, 2005 Letter from Robert Griscom to Mike Gorman). Gorman's "private" carriage, Griscom opined, "may be conducted under the Rules of FAR Part 91," *id*. at 3, which is titled "Air Traffic and General Operating Rules." Griscom sent a copy of his opinion letter to Monroe P. Balton, FAA Regional Counsel for the Western Pacific Region, who responded that the opinion "accurately reflects the current state of the [FAA's] regulations, Advisory Circular 120-12A and policy on the issue of private carriage." Hearing Ex. C-2, *Sturgell v. Gorman*, at 1 (NTSB Sept. 25, 2007) (Aug. 19, 2005 Letter from Monroe P. Balton to Robert Griscom).

In March 2007, while on routine surveillance at the Long Beach, CA airport, two FAA aviation safety inspectors observed an airplane displaying "Charter advertising" on the side of the fuselage. When questioned by one of the inspectors, Gorman, the airplane's pilot, responded that he did not need an "Air Carrier Certificate" to operate his business. In a subsequent telephone conversation, the other inspector told Gorman that "he might be in violation of Pt. 119.23(b) if he was transporting bank checks for hire without an Air Carrier Certificate." Hearing Ex. C-4, *Sturgell v. Gorman*, at 1 (NTSB Sept. 25, 2007) (Record of Apr. 10, 2007 telephone call from Mike Gorman to Gary Lackey). Gorman insisted that FAR section 119.23(b) did not apply to him because he was in "private carriage" and that he had legal opinions from Griscom and from FAA counsel Balton supporting his position. When contacted by the inspectors, Balton opined that "indeed Mr. Gorman

---

"private" carriage is "an aircraft operation for compensation or hire that does not involve a holding out to others." 14 C.F.R. § 119.3; *see, e.g.*, 14 C.F.R. § 119.5(h) (contrasting "common carriage" with "noncommon or private carriage").

would need an Air Carrier Certificate if he was transporting for hire in private carriage." *Id.*

In April 2007, according to Gorman, FAA inspector Gary Lackey informed him by telephone that he was "grounded," that he had "received bad advice from [his] attorney" and that he was "operating illegally." Admin. Hearing Transcript, *Sturgell v. Gorman*, at 66 (Sept. 25, 2007 NTSB) (testimony of Gorman) (Hearing Tr.). After being advised by Griscom and other private counsel that Lackey lacked authority to ground him, Gorman called FAA Operations Unit Supervisor Robert W. Kemp. Kemp clarified that Gorman was not "grounded" but Kemp advised Gorman that "operations defined as 'private carriage' require the issuance of an operator's certificate" and that Gorman's operation "appears to meet this definition" and warned him that if Gorman was "engaged in this type of activity, [he] m[ight] be in violation of Title 14 of the Code of Federal Aviation Regulations (Title 14 CFR) and subject to civil penalties." Hearing Ex. C-5, *Sturgell v. Gorman* (NTSB Sept. 25, 2007) (April 20, 2007 Letter from Robert W. Kemp to Mike Gorman).

On May 21, 2007, Balton drafted a memorandum addressing certification requirements for private carriage by a small airplane operator. Hearing Ex. C-6, *Sturgell v. Gorman*, (NTSB Sept. 25, 2007) (May 21, 2007 Memorandum from M. Balton to Long Beach Flight Standards District Offices) (Balton Memo). In it Balton stated that Advisory Circular 120-12A, which he had cited in his earlier opinion, had not been revised since 1986 and therefore did not take into account FAR Part 119, which "was issued and became effective later in time" and therefore "better represents the FAA's position with respect to private carriage." *Id.* at 1. Balton then set out the text of FAR section 119.23(b):

> Each person who conducts noncommon carriage (except as provided in § 91.501(b) of this chapter) or

private carriage operations for compensation or hire *with airplanes having a passenger-seat configuration of less than 20 seats, excluding each crewmember seat,* and a payload capacity of less than 6,000 pounds shall—

> (1) Comply with the certification and operations specifications requirements in subpart C of this part;

> (2) Conduct those operations in accordance with the requirements of part 135 of this chapter, except for those requirements applicable only to commuter operations;

14 C.F.R. § 119.23(b), *quoted in* Balton Memo at 2 (emphasis added). FAR section 119.23(b), Balton noted, "is regulatory in nature and must be complied with," while Advisory Circular 120-12A "is . . . advisory only—a suggested means of complying with the regulations" and "is not regulatory and is not enforced by the FAA." Balton Memo at 2. Under FAR section 119.23, he explained, "large aircraft operators engaged in private carriage must have at least a certificate and operations specifications issued under Part 125, and small aircraft operators must hold a certificate and operations specifications issued under Part 119 and conduct operations in accordance with FAR Part 135." *Id.* He therefore advised that Griscom's opinion, "to the extent it fails to recognize this fact, . . . is in error" and his earlier "concurrence" in Griscom's opinion was "completely in error," admitting that he had "failed to review the requirements of FAR Part 119" and had "only reread the advisory circular." *Id.* at 3.

On June 1, 2001, Lackey drafted a letter to Gorman, with a copy of Balton's memo attached, in which Lackey indicated that "cargo operations of this nature are indeed subject to Title 14 Code of Federal Regulations 119.23(b) and require an air carrier

certificate." Hearing Ex. C-7, *Sturgell v. Gorman*, at 1 (NTSB Sept. 25, 2007) (June 1, 2007 Letter from Gary W. Lackey to Mike Gorman). Thus, Lackey advised, "[c]ontinued operations by you without an air carrier certificate [are] contrary to 14 CFR Part 119 and Part 135 and would be subject to enforcement action." *Id.* Gorman responded in a letter dated June 6, 2007, expressing his disagreement with Balton's revised opinion. Exhibit C-8, *Sturgell v. Gorman*, at 1 (NTSB Sept. 25, 2007) (June 6, 2007 Letter from Mike Gorman to FAA). Following this exchange, Gorman continued to operate his private carriage business as before, without regard to FAR section 119.23(b)'s directives to "[c]omply with the certification and operations specifications requirements in subpart C of [Part 119]"—requiring a covered person to obtain an "operating certificate" and "operations specifications that prescribe the authorizations, limitations, and procedures under which each kind of operation must be conducted," 14 C.F.R. § 119.33(b)—and to "[c]onduct [his] operations in accordance with the requirements of part 135."

On August 27, 2007, the FAA served an emergency order revoking Gorman's commercial pilot certificate because, notwithstanding he was "advised by the FAA that [his] cargo operations were in violation of the FAR's," "on at least 20 occasions" he "continued said operations" from San Diego to Long Beach as "pilot in command," "in deliberate disregard of FAA notification . . . that such operation was in violation of the FAR's," in particular, FAR section 119.23(b). Emergency Order of Revocation, *Michael Charles Gorman*, Case No. 2007WP050040, at 1-2 (FAA Aug. 27, 2007). The emergency order stated that each of the two aircraft Gorman was operating had "a passenger-seat configuration of less than 20 seats" and a "payload capacity of less than 6,000 pounds" and his operation of the flights "constituted noncommon carriage or private carriage operations, for compensation or hire," thereby triggering the certification and operations specifications

requirements of FAR section 119.23 as well as the competency and line check requirements of FAR Part 135. *Id*. at 2. The order set out a list of provisions in FAR Parts 119 and 135 that Gorman's operations violated.[2] *Id*. at 2-3. Based on the foregoing, the order concluded:

> As a result of your operation in deliberate disregard of the FAA's notification to you that such operations are in violation of the FAR's, the Administrator finds that you lack the qualification necessary to hold a commercial pilot certificate, or an airman pilot certificate of any kind. She therefore has determined that safety in air commerce or air transportation and the public interest require the revocation of any and all airman pilot certificates you hold. The Administrator further finds that an emergency requiring immediate action exists with respect to safety in air commerce or air transportation.

*Id*. at 4. Accordingly, the emergency order directed that any certificate Gorman held be immediately revoked and surrendered to FAA Regional Counsel and that for one year thereafter, no application for a new airman certificate be accepted from him nor an airman certificate issued to him. *Id*.

Gorman appealed and a hearing was conducted by an NTSB administrative law judge (ALJ) on September 25, 2007. At the hearing, Gorman argued that "Part 119.23(b) absolutely does not apply to all cargo operations, noncommon carriage in aircraft of [his] class." Hearing Tr. at 71. He reasoned that FAR section 119.23(b) "only applies to aircraft having a passenger seat configuration" and his aircraft "d[id] not have a passenger seat configuration" because it did not have any passenger seats. *Id*.

---

[2]These sections are 14 C.F.R. §§ 119.5(g), 119.23(b)(1)-(2), 119.33(b)(2)-(3), 135.295(a), 135.299(a)-(b). Hearing Tr. at 120-21.

The FAA disagreed, maintaining that FAR section 119.23 applied to Gorman's aircraft because "[z]ero is less than 20." *Id*. at 14.

At the conclusion of the hearing, the ALJ issued an oral ruling affirming the emergency order with respect to all but one of the alleged regulatory violations as well as the revocation of Gorman's pilot's certificate.[3] *Id*. at 120-21, 124. The ALJ concluded that, contrary to Gorman's contention, the FAA reasonably interpreted FAR section 119.23(b)(1)-(2), which applies to "airplanes having a passenger-seat configuration of less than 20 seats," to apply to aircraft such as Gorman's which have no passenger seats:

> If you have zero seats, you do have less than 20, in my view.
>
> I, therefore find on the reasonable interpretation of this regulation, . . . that Respondent did, in fact, change the passenger seat configuration in his aircraft by removing all of the passenger seats to zero seats, and zero seats is less than 20.

Hearing Tr. at 117-18. Based on his interpretation of FAR section 119.23(b), the ALJ found that Gorman violated not only FAR section 119.23(b) but also FAR sections 119.5(g), 119.33(b)(2), 119.33(b)(3), 135.293(a), 135.293(b) and 135.299(a), the requirements of which were triggered by FAR section 19.23(b). The ALJ also found that revocation was the appropriate sanction because:

> [G]iven the fact that [Gorman] was advised in June, whether or not he agreed with it, he was advised that his operations were in probable violation of the

---

[3]The ALJ found that Gorman did not violate FAR section 119.23(b)(3) as set forth in the emergency order.

appropriate regulation, he intentionally continued to operate upon his own determination that the FAA was wrong and he was right. . . .

This was deliberate choice by [Gorman] to disregard the advice and caution issued to him on his belief that his interpretation was correct and nobody in the [FAA] that he had dealt with knew what they were talking about. . . . That is inappropriate. If pilots simply disregard some portion of the regulations, operational, medical, whatever, maintenance, and say whatever they require or your interpretation that I've got to use this tool or this condition does not prohibit safe performance or I don't have to comply, that would be chaos.

*Id*. at 122-23.

Gorman appealed the ALJ's decision to the NTSB, which issued an order on November 1, 2007, denying the appeal and affirming the ALJ's decision upholding the FAA's emergency order (except as to FAR section 119.23(b)(3)). Opinion and Order, *Sturgell v. Gorman*, Docket SE-18094 (NTSB Nov. 1, 2007). The Board concluded that (1) it is "bound by all validly adopted interpretations of laws and regulations that the Administrator carries out, unless [it] find[s] that an interpretation is arbitrary, capricious, or otherwise not in accordance with law," *id*. at 6, and (2) that section 119.23(b) is "clear on its face" and the FAA's interpretation of it was therefore "not arbitrary, capricious or contrary to law and precedent," *id*. at 8.

Gorman filed a petition for review with this court on December 31, 2007. On January 28, 2008, Gorman filed a petition for rehearing with the NTSB, which the Board denied in an order issued May 13, 2008 for the following reason:

Respondent filed a petition for review of his case in the United States Court of Appeals for the District of Columbia Circuit on December 31, 2007, and that court has so notified the Board; therefore, the Board no longer has jurisdiction and the petition is subject to dismissal.

*Sturgell v. Gorman*, Docket SE-18094 at 1-2 (NTSB May 13, 2008) (NTSB Rehearing Order) (footnotes omitted) (citing 49 U.S.C. § 1153(b)(3)).  Alternatively, the Board noted that, even if the filing of the petition for judicial review did not deprive it of jurisdiction, Gorman's petition for rehearing  "would have been untimely, and therefore subject to dismissal."  *Id.* at 2 n.3.

On July 11, 2008, we ordered *sua sponte* "that the parties address in their briefs whether petitioner's filing of a petition for agency rehearing after filing this petition for review renders the petition for review incurably premature."  Order, *Gorman v. NTSB*, No. 07-1532, at 1 (July 11, 2008).

## II.

We first address the jurisdictional issue and then move on to the merits.

### A. Jurisdiction

As recited *supra*, the NTSB issued its final decision on the merits on November 1, 2007 and Gorman filed a petition for review with the court on December 31, 2007.  Gorman subsequently filed a rehearing petition with the NTSB on January 28, 2008—outside the prescribed  30-day window, *see* 49 C.F.R. § 821.50(a)-(b) (petition "for rehearing, reargument, reconsideration or modification of a Board order on appeal from a law judge's initial decision or order . . . must be filed with the Board, and simultaneously served on the other parties, within 30 days after the date of service of the Board's order on appeal from the law judge's initial decision or order")—and on May 13,

2008, the NTSB issued the order dismissing the rehearing petition. Pursuant to the court's July 11, 2008 order, the parties have briefed the issue whether Gorman's petition here is "incurably premature." Order, *Gorman v. NTSB*, No. 07-1532, at 1 (citing *Collins v. NTSB*, 351 F.3d 1246, 1250 (D.C. Cir. 2003); *TeleSTAR, Inc. v. FCC*, 888 F.2d 132, 133-34 (D.C. Cir. 1989)). The parties agree that the petition is not incurably premature. We agree as well.

Our caselaw "treat[s] a petition for review filed during the pendency of a request for administrative reconsideration as 'incurably premature,' and in effect a nullity." *Collins*, 351 F.3d at 1250 (internal citation omitted); *see also TeleSTAR, Inc.*, 888 F.2d at 134 ("filing of a challenge to agency action before the agency has issued its decision on reconsideration is incurably premature" so that "when a petition for review is filed before the challenged action is final and thus ripe for review, subsequent action by the agency on a motion for reconsideration does not ripen the petition for review or secure appellate jurisdiction"). In this case, we confront a question left unresolved in *Collins*. In that case, the petitioner had filed two petitions for judicial review—one 59 days after the NTSB's initial decision and one 44 days after the NTSB's dismissal of an untimely request for administrative reconsideration (filed between the initial Board decision and the first petition for judicial review). We concluded that the petition for judicial review was not "incurably premature" for two alternative reasons: "If the request suspended the running of the time limit for appeal, then the . . . second petition for review was timely; if it did not, then the initial petition was effective. Either way, we have jurisdiction." *Collins*, 351 F.3d at 1250. Because jurisdiction existed whether or not the untimely reconsideration request tolled the time for filing a petition for judicial review, the court found it unnecessary to determine "the precise effect of [an] untimely request for NTSB reconsideration." *Id*. We now address this issue squarely and conclude the filing of an

12

untimely petition for agency reconsideration does not render incurably premature  an otherwise valid petition for judicial review.

In *United Transportation Union v. ICC*, 871 F.2d 1114 (D.C. Cir. 1989), we concluded, as had other circuits, that the filing of a timely petition for reconsideration "must render the underlying agency action nonfinal," explaining:

> "Where a motion for rehearing is in fact filed there is no final action until the action is denied * * *. [W]hen the party elects to seek a rehearing *there is always a possibility that the order complained of will be modified in a way which renders judicial review unnecessary*.  Practical considerations[,] therefore, dictate that when a petition for rehearing is filed, review may properly be deferred until this has been acted upon."

871 F.2d at 1116-17 (quoting *Outland v. CAB*, 284 F.2d 224, 227-28 (D.C. Cir. 1960)) (emphasis in *United Transp. Union*). Once the time to file for agency reconsideration is past, however,  the order is final and ripe for review and the filing of a subsequent—late—petition for administrative rehearing does not vitiate the timely judicial petition, at least not where, as here, the agency does not consider the merits of the tardy request. *Cf. Bowman v. Lopereno*, 311 U.S. 262, 266 (1940) ("The filing of an untimely petition for rehearing which is not entertained or considered on its merits, or a motion for leave to file such a petition out of time, if not acted on or if denied by the trial court, cannot operate to extend the time for appeal."); *see* NTSB Rehearing Order (dismissing Gorman's petition for  rehearing, alternatively, for lack of jurisdiction or tardiness). Thus, Gorman's late petition for Board rehearing filed on January 28, 2008 does not affect our jurisdiction, which attached upon his

filing of the December 31, 2007 petition for judicial review.[4] This holding is consistent with our cases that have found a petition for judicial review to be incurably premature, as each of the latter involved a timely request for administrative review. *See*, *e.g.*, *Clifton Power Corp. v. FERC*, 294 F.3d 108 (D.C. Cir. 2002); *TeleSTAR, Inc.*, *supra*; *United Transp. Union*, *supra*.

### B. The Merits

Gorman offers three challenges to the NTSB's affirmance of the FAA's emergency order. We address each challenge *seriatim*.

### 1. FAR section 119.23(b)

Gorman argues that the NTSB erred in two respects when it concluded that the language of FAR section 119.23(b) requires Gorman to obtain an operating certificate and operations specifications and to comply with Part 135. We find neither argument persuasive.

First, Gorman contends the regulation's language unambiguously excludes Gorman's two aircraft from its requirements for the reason he argued before the NTSB, namely, that, because all of the seats have been removed from each aircraft, neither can be described as "having a passenger-seat configuration of less than 20 seats." Instead, he maintains that his airplanes now have no seating configuration whatsoever.

---

[4]Our holding does not necessarily bar the agency from entertaining a late filed petition for rehearing or the court from remanding to the agency if it deems the agency likely to reconsider its decision. *See* 49 C.F.R. § 821.11(b) ("Extensions of time to file petitions for reconsideration shall . . . be granted . . . only in extraordinary circumstances."); *cf. Williston Basin Interstate Pipeline Co. v. FERC*, 165 F.3d 54, 62-63 (D.C. Cir. 1999) (remanding to agency to reconsider in light of agency's "recent refinement" of model).

We conclude that the regulation is ambiguous regarding its applicability to aircraft like Gorman's and that the FAA reasonably determined that it does apply.

In common parlance, the phrase "airplanes having a passenger-seat configuration of less than 20 seats" may be reasonably understood to include aircraft having no passenger seats at all, as the FAA interpreted it. As the ALJ explained: "Zero is, in fact, a number" and "[i]f you have zero seats, you do have less than 20." Hearing Tr. at 117. Any doubt that this is a permissible interpretation is dispelled by the language of the regulation's heading which reads: "Operators engaged in passenger-carrying operations, *cargo operations*, or both with airplanes when common carriage is not involved," 14 C.F.R. § 119.23 (emphasis added). This language plainly includes an aircraft that carries cargo only—and therefore has zero passenger seats—as well as one that carries passengers only or a combination of passengers and cargo, both of which, by contrast, would necessarily have at least one passenger seat.[5]

---

[5]Gorman asserts that "longstanding legal principles" prohibit considering the regulation's heading to elicit the meaning of its text. Reply Br. at 13-14 (citing *Bhd. of R.R. Trainmen v. Balt. & Ohio R.R.*, 331 U.S. 519, 528 (1947); *Holland v. Williams Mountain Coal Co.*, 256 F.3d 819, 822 (D.C. Cir. 2001)). The cases on which Gorman relies, however, apply specifically to statutes "[w]here the text is complicated and prolific" so that "headings and titles can do no more than indicate the provisions in a most general manner" inasmuch as an "attempt to refer to each specific provision would often be ungainly as well as useless." *R.R. Trainmen*, 311 U.S. at 528. In this case, by contrast, we confront a short and simple, if ambiguous, subsection of a regulation in which the language we construe is clarified by the heading. The precedent Gorman invokes counsels only against using a heading to "limit the plain meaning of the text." *Id*. at 528-29; *see, e.g.*, *Holland*, 256 F.3d at 822 (declining "to use a heading, which normally is a kind of shorthand, to justify stripping the actual text of two words"). It acknowledges that headings "are of use . . . when they

Second, Gorman contends that even if the regulation is ambiguous, the NTSB erred in deferring to the FAA's interpretation for two reasons: (1) "the NTSB itself acted arbitrarily and capriciously by failing to consider and address the arguments that Mr. Gorman raised against such deference" and (2) "the NTSB erred in failing to recognize that the FAA's interpretation of its regulations was arbitrary, capricious, and otherwise not entitled to any deference." Pet'r Br. at 28.

Both arguments misapprehend—and limit—the nature of our review. With regard to the meaning of the FAA's regulation, our review does not, as Gorman suggests, involve "two distinct levels of deference"—ours to the NTSB and the NTSB's to the FAA. The NTSB does indeed owe deference to the FAA's interpretation of the regulation: "When conducting a hearing under [49 U.S.C. § 449(d)], the Board . . . is bound by all validly adopted interpretations of laws and regulations the Administrator carries out and of written agency policy guidance available to the public related to sanctions to be imposed under this section unless the Board finds an interpretation is arbitrary, capricious, or otherwise not according to law." 49 U.S.C. § 44709(d). Nonetheless, while we review the NTSB's decision to determine whether it is " 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' " when we construe the regulation, "like the NTSB, we must defer to the FAA's interpretations of its own aviation regulations." *Garvey v. NTSB*, 190 F.3d 571, 577 (D.C. Cir. 1999) (quoting 5 U.S.C. § 706(2)(A)) (citing *Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 147, 150-57 (1991)). Thus, we will reject a Board decision as not in accordance with law if it does not properly defer to the FAA's interpretation. *See id.* at 586. As we have already explained, the FAA's interpretation of the ambiguous phrase in FAR section 119.23 ("having a

shed light on some ambiguous word or phrase," *R.R. Trainmen*, 311 U.S. at 529, as is the case here.

passenger-seat configuration of less than 20 seats") is reasonable. Deferring to the FAA, we must therefore uphold its interpretation—whether or not the Board may have erred, as Gorman claims, in failing to respond to all of his arguments.

Gorman also challenges the FAA's interpretation on three grounds: (1) the regulation unambiguously excludes Gorman's aircraft from its scope, Pet'r Br. at 32; (2) the FAA changed course without "reasoned analysis" when Balton revised his opinion, *id*. at 34 (citing *N. Mun. Distribs. Group v. FERC,* 165 F.3d 935, 941 (D.C. Cir. 1999)); and (3) the court should not defer to an agency interpretation "developed for the first time in connection with litigation or enforcement proceedings," Pet'r Br. at 35 (citing *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212 (1988)).  We have addressed and rejected the first argument because the regulation's language does not bear the unambiguous meaning that Gorman ascribes to it.  As for the second, Balton did not change his interpretation of FAR section 119.23—his initial advice was based on the advisory circular and not the regulation, which Balton acknowledged he had not consulted.  In any event, the precedent Gorman cites requires that an agency explain a deviation from its "precedent and previous practices," *N. Mun. Distribs.*, 165 F.3d at 941, and not from a position adopted by an agency official early in the course of the same proceeding.  Gorman's third argument ignores our own precedent which holds that "[t]he FAA is not required to promulgate interpretations through rulemaking or the issuance of policy guidances, but may instead do so through litigation before the NTSB." *Garvey*, 190 F.3d at 577 (rejecting NTSB argument that FAA "offered 'no evidence of *any* policy guidance written by the FAA, validly adopted or otherwise' " but "merely offered the 'litigation statements' of FAA counsel, as well as citations to the Board's own case law," former of which "NTSB believed . . . insufficient to qualify for Board deference under section 44709(d)(3)") (emphasis in original).

## 2. The FAA's Statutory Authority

Next, Gorman asserts that if (contrary to his view) FAR section 119.23 requires that he obtain a Part 135 certificate, the regulation exceeds the FAA's authority in two respects. We reject this argument as well.

First, Gorman contends that FAR section 119.23 is *ultra vires* because the FAA's authority to issue operating certificates is statutorily limited by 49 U.S.C. § 44702 to issuing operating certificates to "air carriers" and "airports"—and Gorman is neither one. Section 44702(a) provides in relevant part: "The Administrator of the Federal Aviation Administration may issue airman certificates, type certificates, production certificates, airworthiness certificates, *air carrier operating certificates, airport operating certificates*, air agency certificates, and air navigation facility certificates under this chapter." 49 U.S.C. § 44702 (emphasis added). It is true that this provision does not specifically authorize the FAA to issue an operating certificate to Gorman as he operates neither as an "airport" nor as an "air carrier," the latter being defined as "a citizen of the United States undertaking . . . to provide . . . foreign air transportation, interstate air transportation, or the transportation of mail by aircraft," none of which is a part of Gorman's operations. *Id*. § 40102(a)(2)(5). Nor, however, does it prohibit the FAA from issuing operating certificates in other circumstances under the authority of a different statute.[6] In this case, as the NTSB asserts, such certification authority is found in 49 U.S.C. § 44701.

---

[6]The Congress has itself recognized that the list of certificates has proved incomplete and has therefore, as Gorman notes, inserted additional kinds of certificates over the years. *See, e.g.*, Vision 100—Century of Aviation Reauthorization Act, Pub. L. No. 108-176, § 227, 117 Stat. 2490, 2531 (2003) (authorizing "design organization certificates").

Section 44701 provides in relevant part:

The Administrator of the Federal Aviation Administration shall promote safe flight of civil aircraft in air commerce by prescribing—

. . .

>    (5) regulations and minimum standards for other practices, methods, and procedure the Administrator finds necessary for safety in air commerce and national security.

49 U.S.C. § 44701(a)(5). This statute grants the FAA "broad authority to regulate civil aviation." *Ass'n of Flight Attendants—CWA v. Chao*, 493 F.3d 155, 157 (D.C. Cir. 2007) (citing 49 U.S.C. § 44701). The broad statutory language directing that the FAA promulgate regulations as "necessary for safety in air commerce" easily encompasses the authority to require operating certificates for commercial aircraft operations be they common carriage or private. *See FAA v. Landy,* 705 F.2d 624, 629 n.6 (2d Cir. 1983) ("The appellants contend that the FAA may not . . . require operating certificates that are 'other than . . . air carrier' or airport operating certificates. . . . But the statute is plainly broad enough to empower the FAA to regulate commercial operators."). This interpretation is consistent with—if not required by—49 U.S.C. § 44711(a)(5), which provides: "A person may not— . . . operate aircraft in air commerce in violation of *a regulation prescribed or certificate issued* under section 44701(a) or (b) or any of sections 44702-44716 of [Title 49]" (emphasis added). The quoted language recognizes that both regulations and certificates may be prescribed or issued under *either* "section 44701(a) or (b)" *or* "sections 44702-44716."[7]

---

[7]Gorman contends that section 44711(a)(5) should be read to mean that only regulations may be prescribed pursuant to section

Second, Gorman argues the FAA lacked statutory authority to require Gorman to hold an operating certificate because the FAA has itself limited its certificating authority under Part 119 to operations in "air commerce." *See* 14 C.F.R. § 119.1(a)(1) ("This part applies to each person operating or intending to operate civil aircraft—(1) As an air carrier or commercial operator, or both, in air commerce; . . . ."). In particular, Gorman contends he does not operate aircraft as a "commercial operator" which involves "air commerce"—defined by regulation to include "*interstate, overseas, or foreign air commerce,*" 14 C.F.R. § 1.1 (emphasis added)[8]—because his flights are "wholly intrastate, involving transportation of cargo between Long Beach, California and Montgomery Field in San Diego." Pet'r Br. at 40. Gorman acknowledges, however, that "air commerce" includes not only "interstate, overseas, or foreign air commerce" but also "*any* operation or navigation of aircraft . . . which may endanger safety in, interstate, overseas, or foreign air commerce," 14 C.F.R. § 1.1 (emphasis added), and he does not deny that operations such as his could pose such a danger so as to require certification and the consequent regulatory compliance. *See Hill v. NTSB*, 886 F.2d 1275, 1280 (10th Cir.

---

44701 and that certificates must be issued pursuant to sections 44702-44716. *See* Pet'r Supp. Br. (filed Jan. 15, 2009). We find this cramped reading less natural and therefore less likely than the meaning we ascribe in the text.

[8]The definition reads in its entirety:

Air commerce means interstate, overseas, or foreign air commerce or the transportation of mail by aircraft or any operation or navigation of aircraft within the limits of any Federal airway or any operation or navigation of aircraft which directly affects, or which may endanger safety in, interstate, overseas, or foreign air commerce.

14 C.F.R. § 1.1.

1989) ("The statutory definition of 'air commerce' is therefore clearly not restricted to interstate flights occurring in controlled or navigable airspace. The face of the statute expressly provides that 'air commerce' includes '*any* operation or navigation of aircraft which directly affects, or which may endanger safety in, interstate, overseas, or foreign air commerce.' " (quoting 49 U.S.C. § 1301(4)) (emphasis by *Hill* court); *Ickes v. FAA*, 299 F.3d 260, 263 (3d Cir. 2002) (rejecting Commerce Clause challenge to regulation of purely recreational and intrastate flights on grounds that "Congress's power over interstate commerce includes the power to regulate use of the nation's navigable airspace, which is a channel of interstate commerce" and "because airplanes constitute instrumentalities of interstate commerce, any threat to them . . . is properly subjected to regulation even if the threat comes from a purely intrastate activity") (internal citations omitted). The language "may endanger" also makes clear that to come within the regulation, it is not necessary that an airplane actually pose a demonstrable threat, as Gorman suggests. *See Hill*, 886 F.2d at 1280 ("The fact that the pilot's unsafe conduct in a particular instance did not actually endanger interstate, overseas, or foreign air commerce does not exempt such conduct from FAA jurisdiction.").

### 3. Appropriateness of Sanction

Finally, Gorman contends that the sanction the FAA imposed—revocation of his commercial pilot certificate—is excessive and arbitrary and capricious. Because Gorman failed to raise this objection before the NTSB, and offers no reasonable ground for this failure, we conclude that he has waived the objection. *See* 49 U.S.C. § 1153(b)(4) ("In reviewing an order under this subsection, the court may consider an objection to an order of the Board only if the objection was made in the proceeding conducted by the Board or if there was a reasonable ground for not making the objection in the proceeding.").

For the foregoing reasons, the petition for review is denied.

*So ordered.*